

FILED
2016 Jul-15  AM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

ROY LEE DAVIS,          )
                                  )

        Plaintiff          )
                                  )

v.                             )    CASE NO.
                                  )

MADISON COUNTY, ALABAMA;    )
BLAKE DORNING;               )
STEVE MORRISON;             )
ADVANCED CORRECTIONAL     )
HEALTHCARE, INC.;           )
NORMAN R. JOHNSON, M.D.;     )
ARTHUR M. WILLIAMS, M.D.;    )
JANICE TOWNSEND;           )
SHERRI HAKES;                )
MARIA SANCHEZ;              )
TANYA JONES;                 )
DEE FLORENCE;               )
ROSE MOORE;                  )
ROBERTA DOUGLAS;          )
DEMETRUS JOHNSON;        )
DOUGLAS SMITH;             )
EMMANUEL MBI;             )
VONETTA HOLT;              )
JOYCE WILLIAMS;           )
VICTORIA ANN EASON-GILES;    )
DONNA GUNN;                )
SENFRONIA LONG;           )
CHARITY BEASLEY;         )
SHEREE KING;               )
VIKKI MIRANDA;            )
CASSIE MALONEY;          )
MILDRED PATTON;          )
SHELBY SPICER;            )
JONATHON LONG; and        )
SCOTT BROWN;              )

Defendants.                                    )

## COMPLAINT

Plaintiff Roy Lee Davis complains of defendants, stating as follows:

### Nature of the Action

1.      This is a civil action brought by Davis who was denied certain constitutional rights by defendants while incarcerated in the Madison County Jail. Specifically, defendants were deliberately indifferent to Davis' serious medical needs in violation of Davis' rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution.  Plaintiff also brings state law claims against the health care defendants.

### Jurisdiction and Venue

2.      This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.      This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

### Parties

4.      Roy Lee Davis is of legal age and a citizen and resident of the state of

2

Alabama.  He resides in Madison County, Alabama.

5.      Defendant Madison County, Alabama is an Alabama county.  It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide medical services at the Madison County Jail.

6.      Defendant Blake Dorning was the Madison County Sheriff at all relevant times.  As the sheriff, among other things, he is responsible for management of the Madison County Jail.  Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison  County Jail.  He is sued in his individual capacity only.

7.      Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

8.      Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.

9.      Defendant Norman R. Johnson , M.D. is a physician who serves as the CEO of ACH.  He is sued in his individual capacity only.

10.      Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

11.     Defendant Janice Townsend is a Licenced Practical Nurse who was employed by ACH as the health services administrator and oversaw medical care at the jail on a day-to-day basis.

12.     Defendant Sherri Hakes is a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

13.     Defendant Maria Sanchez is a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

14.     Defendant Tanya Jones is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

15.     Defendant Dee Florence is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

16.     Defendant Rose Moore is a Licensed Practical Nurse who was employed by ACH to provide nursing and medical services for inmates at the Madison County Jail at all relevant times.

17.     Defendant Roberta Douglas is a Registered Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail

4

at all relevant times.

18.     Defendant Demetrus Johnson is a Licensed Practical Nurse who was employed by ACH to provide nursing and medical services for inmates at the Madison County Jail at all relevant times.

19.     Defendant Douglas Smith is a Licensed Practical Nurse who was employed by ACH to provide nursing and medical services for inmates at the Madison County Jail at all relevant times.

20.     Defendant Emmanuel Mbi is a Registered Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

21.     Defendant Vonetta Holt is a mental health clinician who was employed by ACH to provide mental health services for inmates at the Madison County Jail at all relevant times.

22.     Defendant Joyce Williams was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

23.     Defendant Victoria Ann Eason-Giles was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

24.     Defendant Donna Gunn was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

25.     Defendant Senfronia Long was a correctional officer at the Madison

County Jail at all relevant times.  She is sued in her individual capacity only.

26.     Defendant Charity Beasley was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

27.     Defendant Sheree King was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

28.     Defendant Vikki Miranda was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

29.     Defendant Cassie Maloney was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

30.     Defendant Mildred Patton was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

31.     Defendant Shelby Spicer was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

32.     Defendant Jonathon Long was a correctional officer at the Madison County Jail at all relevant times.  He is sued in her individual capacity only.

33.     Defendant Scott Brown was a correctional officer at the Madison County Jail at all relevant times.  He is sued in her individual capacity only.

## Facts

34.     Roy Lee Davis turned himself in on a warrant, was arrested, and was

6

booked into the Madison County Jail on July 17, 2014, at approximately 4:35 p.m.

35.    Davis is an alcoholic. Nevertheless, Davis was apparently not identified as a person likely to experience withdrawal.

36.    From July 18 until July 21, plaintiff experienced increasing symptoms of withdrawal.

37.    Still, for unknown reasons, Davis was apparently not identified as a person undergoing withdrawal.

38.    By July 21, Davis was experiencing severe withdrawal symptoms, including hallucinations, confusion, and "severe hand tremors." Davis was seen by defendant Sanchez, observed Davis to have these symptoms and others, identified Davis as being in severe delirium tremens (DTs), and placed Davis in a medical observation cell.

39.    Defendant Sanchez or defendant Rose contacted defendant Williams, who gave a verbal order for medication.

40.    Davis' severe DTs, a life-threatening condition, should have been treated as a medical emergency.

41.    Medical staff at the jail know severe DTs is a life-threatening medical condition.

42.    Nevertheless, the long-standing practice at the jail has been to attempt to manage severe DTs at the jail.

43.     This practice, and the dangers of it, were known to jail administration, including Dorning and Morrison.

44.     In fact, as recently as March 2013, defendant Johnson had provided jail training to Morrison and other members of the jail correctional and medical staff on the dangers of DTs.

45.     ACH had also provided training videos to the jail related to the dangers of DTs.

46.     Nevertheless, because it saved money, the practice was allowed to persist.

47.     By July 21, 2014, due to severe DTs, Davis' need for medical care in a hospital was such that it would have been obvious even to a layperson.

48.     From July 21, 2014, to July 23, 2013, Davis' condition continued to deteriorate.

49.     During this period, Davis was seen by numerous ACH employees, including defendants Sanchez, Florence, and Johnson on July 21; defendants Johnson and Florence on July 22:  defendants Douglas and Holt on July 22, and defendants Jones and Williams on July 23.

50.     The other individual ACH defendants, through either direct observation and contact or through being informed by other jail personnel, also became aware of Davis' condition between July 21 and 23.

8

51.     During much of July 21 and 22 Davis fought to get out of his isolation cell.

52.     By July 23, when Davis was allegedly seen by defendants Jones and Williams, Davis was not able to walk and had become largely unresponsive.

53.     Between July 21 and 23, Davis' condition was also known to numerous correctional officers, including each of the individual correctional officer defendants.

54.     On July 24, jail management personnel, with the knowledge and approval of defendant Morrison, contacted court personnel in order to get plaintiff released from the jail and avoid sending him to the hospital and incurring the costs of the hospitalization.

55.     As a direct and proximate result of the failure and refusal of the individual defendants except Dorning to secure emergency medical treatment for Davis, Davis experienced unnecessary pain and suffering and incurred unnecessary medical expenses.

56.     After Davis was released, he was taken by his family to the emergency room at Madison Hospital, then transferred to Huntsville Hospital, where he was admitted and spent three days.

57.     All defendants were jointly and severally the proximate cause of Davis' pain and suffering.

58.     The actions of jail and ACH personnel indicate systemic breaches of

fundamental standards of correctional management and correctional health care.

59.    These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

60.    The treatment of Davis falls far below the standard of correctional health care.

61.    Because Davis was not appropriately treated, he experienced unnecessary pain and suffering and incurred unnecessary medical costs.

62.    All of the individual defendants identified above acted with malice and/or with reckless disregard for Davis' constitutional rights.

63.     Davis' serious medical needs were ignored because of the customs and policies of defendants Madison County, Dorning, Morrison, Williams, Townsend, and ACH of deliberate indifference to the serious medical needs of inmates in the Madison County Jail.

64.     With deliberate indifference to the serious medical needs of inmates, defendants Madison County, Dorning, Morrison, Williams, Townsend, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions and failed to adequately train jail jailers and medical staff, with the foreseeable result that inmates such as Davis would not receive appropriate treatment.

65.    More generally, defendants Madison County, Dorning, Morrison,

10

Williams, Townsend, and ACH have established deliberately-indifferent customs and policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

66.    Defendants Madison County, Dorning, Morrison, Williams, Townsend, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate.  This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers.  Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

67.    Defendants Madison County, Dorning, Morrison, Williams, Townsend, and ACH were on notice that the above-described customs and policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from jailers, from their own observations, from common sense, from other lawsuits, and in other ways.

68.    During 2013 at least three inmates died as a result of the failure of ACH and correctional personnel at the Madison County Jail to provide inmates with medical care, and the undersigned has filed suit on behalf of each of the families.

11

69.   Listau died in March. The case number is 5:14-CV-1309-CLS.

70.   Listau died from broken bones she suffered as a result of one or more falls caused by delirium tremens-related seizures.  Listau was suffering from advanced DTs when she arrived at the jail and clearly needed to go to the hospital, as severe DTs is a life-threatening condition that needs to be treated as a medical emergency.   *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm. Even though Listau was identified as suffering from severe DTs shortly after she arrived in the jail, she was not taken to the hospital.  She was placed in a medical watch cell.  She deteriorated rapidly over the course of 24-plus hours in the jail.  Listau's deterioration was observed by correctional and ACH personnel.  No action was taken to help Listau until she was found non-responsive.  By then it was too late.

71.   Deundrez Woods died in August.  The case number is No. 5:14-cv-01964-KOB.

72.   Woods experienced a severe and sudden change in mental functioning in late July 2013, was moved into a medical watch cell on August 6, 2013, and continued to deteriorate from August 6 until he was found non-responsive on August 19, 2013. By at least August 15, when Woods was taken by wheelchair to court, Woods was incoherent and not ambulatory.  From August 15 until he was found non-responsive on August 19, while being checked regularly by correctional officers and

ACH nurses, Woods went from incoherent and non-ambulatory to barely responsive to dead.  During this period, Woods did not eat or drink and did not even have his vital signs checked.

73.     Tanisha Jefferson died in October.  The case number is 5:14-cv-01959-AKK.

74.     For at least several days before her death, Jefferson complained of severe abdominal pain.  She cried and begged to be able to go to the hospital.  Her severe abdominal pain, an obvious sign something was seriously wrong, was known to correctional and ACH medical personnel for many days prior to her death, yet the only treatment she received was a laxative. The abdominal pain turned out to be a heart attack, from which Jefferson eventually died. Roughly 24 hours before she died, she was brought by a correctional officer to see a nurse. She was obviously in severe distress and was even having difficulty breathing on top of severe abdominal pain, yet she was not sent to the hospital or even seen by Williams. Even when her condition rapidly deteriorated the night she died, emergency personnel were not contacted.  Instead, Jefferson was taken to the medical department.  Emergency personnel were only contacted when Jefferson became non-responsive.

75.     All three inmates died even though they had been seen by ACH personnel.

76.     All three inmates died when ACH personnel refused to send them to the

hospital.

77.    In all three cases, correctional officers deferred to ACH medical personnel even though it was obvious ACH was doing nothing for the inmate.

78.    In all three cases, correctional officers deferred to ACH medical personnel even though it would have been obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment.

79.    The same pattern continued with the treatment of Whitney Foster in April 2014. The case number 5:16-cv-00521-MHH. Whitney, who is not represented by the undersigned, lived but suffered neurological damage and cortical blindness following seizures and strokes over numerous days that medical and correctional personnel ignored until it was too late.

80.    Correctional officers deferred to ACH personnel because they were trained to do so.

81.    Correctional officers did not defer to ACH in ignorance, however.

82.    ACH had been the contractor at the Madison County Jail since before 2010.

83.    It was well known to Madison County correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care.

84.    Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety.

14

85.    Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs.

86.    These concerns with inmate healthcare costs have been reported in the media.  Thus, an April 2014 AL.com article, for which Morrison and ACH CEO Norman Johnson were interviewed, does not mention the three 2013 deaths or improving inmate healthcare but rather discusses the budget problems created by catastrophic cases that can "really cripple your budget," in the words of Morrison, and the "aggressive pursuit" of cost savings by Morrison.

87.    Consistent with this deferral-to-ACH policy, neither Dorning nor Morrison took any steps to investigate the circumstances of the three deaths.

88.    This has been a longstanding practice of Dorning and, since he was hired in October 2010, Morrison.

89.    Morrison was hired to cut costs at the jail.

90.    The failure and refusal to investigate serious incidents is a more general practice of Dorning, who has refused to investigate serious allegations against his deputies, as reflected by the public comments of Dorning's chief deputy regarding the revenge beating of Robert Bryant.

91.    Dorning has completely failed and refused to investigate serious

15

allegations against those he supervises, whether as law enforcement officers or correctional officers.

92.     Moreover, through litigation in the three death cases, it has become apparent that Madison County, correctional, and/or ACH personnel destroyed or altered records, including email, electronic medical records, and the electronic jail management system in an effort to cover up the true circumstances of the deaths and minimize any potential liability.

93.     Even during the lawsuits, correctional personnel intentionally made the audit log database that would show the author, substance, and other information regarding the alterations to the jail electronic records completely inaccessible.  It is not yet known if the data can be recovered from backup and other media.

94.     And it appears that ACH has intentionally created an electronic medical records system that allows ACH personnel to alter records after a death or other significant adverse event and that does not preserve the audit trail information that would permit the details regarding alterations to be known.

95.     The uninvestigated 2013 deaths followed on the heals of at least three deaths in the preceding two-and-a-half years.

96.     In August 2010, Julie Jean died under circumstances similar to those in the 2013 deaths, particularly Woods' death. Like Woods, Jean, during her final days, was in medical watch, was checked by correctional officers every 15 minutes, did not

16

eat or drink in substantial amounts, did not have her vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until she became non-responsive.  She died as a result of lithium toxicity.

97.    There was no investigation of the death of Jean by Dorning or his designee.

98.    In December 2011, Emanuel Patterson died from lithium toxicity under nearly identical circumstances to those in the Jean case.  Patterson was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have his vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until he became non-responsive.

99.    There was no investigation of the death of Patterson by Dorning or Morrison.

100.    Frederick Foster died in a restraint chair in a medical watch cell in May 2012.  Like Jean and Patterson (and Woods), Foster was out of touch with reality, did not eat or drink in substantial amounts, did not have his vital signs monitored, and deteriorated over the course of several days as correctional officers and ACH personnel watched.  No action was taken until he became non-responsive.

101.    There was no investigation of the death of Foster by Dorning or Morrison.

17

102.   Of course, others have suffered and been lucky enough to survive.

103.   As a result of publicity regarding the 2013 death lawsuits, the undersigned has received information regarding other incidents involving deliberate indifference to medical needs under ACH, including a woman who could have died from an abscessed tooth that was ignored for two months and more than one inmate who was not taken to the hospital for many hours despite obvious heart attack symptoms.

104.   Medical care at the jail is and has been a regular subject of inmate grievances.

105.   While not all inmate grievances have merit, pursuant to longstanding practice, grievances related to medical care are not investigated by Madison County correctional personnel or ACH.

106.   Pursuant to longstanding practice, all grievances regarding jail medical care are turned over to ACH and are not reviewed by Dorning or Morrison or any other correctional officer or correctional supervisor.

107.   Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel.

108.   Dorning, Morrison, Johnson, Williams, Townsend, and ACH have failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least 6 deaths over the course of just over three years

18

(August 2010 to October 2013).

109.   Even after the 2013 death lawsuits, Dorning's comments to the media make clear Dorning believes the responsibility for the deaths and for making changes lies with ACH.  "I'm sure ACH will evaluate how they do things," Dorning told a reporter.

110.   Dorning's claim that he believes ACH will reevaluate in light of the lawsuits is not credible.

111.   Dorning and Morrison know from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will conduct no evaluation and institute no training or other changes.

112.   Dorning and Morrison know that they never requested ACH to make changes or improve the care of inmates.

113.   Dorning and Morrison have never even requested that ACH report to them regarding the quality of the care provided inmates.

114.   The sole basis used by Dorning and Morrison to evaluate ACH is cost control.

115.   Consistent with Dorning's and Morrison's laser focus on costs and lack of concern about the quality of inmate healthcare provided by ACH, in the April 2014 AL.com article referenced above, Morrison does not mention the 6 inmates who died while being overseen by ACH personnel since 2010, only the one inmate, Patterson,

who "crippled" the budget with over $300,000 in charges because he was in a coma for an extended period.

116.   The deferral of correctional officers to ACH decisions to delay and deny necessary medical care in the name of cost control is not only a matter of longstanding practice, it is also a matter of contract.

117.   Deferral by correctional officers to ACH deliberate indifference is caused by both the letter of the contract and the structure of the contractual relationship.

118.   ACH has had the Madison County contract since before 2010.

119.   ACH underbid other competitors to get the contract.

120.   ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care like that needed by Listau, Woods, and Jefferson.

121.   ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care.

122.   If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible.

123.   Based on historical healthcare expenditure numbers for the Madison County Jail and reasonable predictions based on data for the inmate population at the jail, the $200,000 per quarter number was designed to give ACH a financial incentive

to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers.

124. Under the contract, if ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

125. As Morrison, to whom Dorning has delegated responsibility for managing the jail, has stated publically, hospitalizations can quickly deplete the quarterly budget.

126. Pursuant to this agreement, correctional officers are trained to defer to ACH regarding medical matters regardless of the severity of the inmate's conditon.

127. Correctional officers are trained not to contact emergency personnel even if there is a medical emergency; instead, they are trained to contact ACH nurses on duty.

128. Correctional officers who have contacted emergency personnel directly have been disciplined.

129. Moreover, the agreement requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to healthcare services.

130. Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's

insurance carrier.

131.   Thus, the contract encourages correctional officers to defer to ACH personnel.

132.   Correctional officers have claimed or are expected to claim they cannot be responsible for deficient medical care by ACH personnel.

133.   Dorning, Morrison, and the correctional officers they supervised, however, were well aware that ACH provided substandard and frequently inhumane medical care.

134.   Correctional officers had this knowledge from the incidents described above, from other similar incidents over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

135.    Defendant Williams has been the Madison County Jail physician for many years, worked under prior contractors, and was known to provide substandard care to inmates.

136.   Defendant Townsend as well has been at the Madison County Jail for years and was known to be deliberately indifferent to inmate medical needs.

137.   In whole or in part because of the agreement, particularly its indemnification provision, Dorning and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

138.   Under the agreement, for Madison County to avoid liability for excess

medical care expenses, it was necessary for defendants Dorning and Morrison and the correctional officers they managed to cooperate with ACH in controlling costs.

139.   Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with serious medical needs.

140.   ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

141.   Defendants Dorning and Madison County were aware of ACH's business model, were aware ACH put cost control over inmate health and safety, yet retained ACH as the contractor  (initially and via contract renewals) because it saved the county money.

142.   Madison County and Dorning rejected other contractors because they believed ACH saved them money.

143.   Thus, Madison County caused or contributed to the above-described customs and policies by not providing adequate funds for inmate medical care.

144.   The primary areas in which ACH implemented cost control measures were staffing, medications, and referrals to outside providers.

145.   In order to control costs, defendant ACH, with the knowledge and consent of defendants Dorning and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau, Woods, and Jefferson.

146.   Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

147.   Defendant Dorning, in turn, via the agreement with ACH and longstanding practice, has delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, he is liable for ACH decisions.

148.   While the agreement gives Dorning and Madison County the authority to hold ACH accountable regarding the costs of inmate healthcare, it provides no mechanism for reporting and accountability regarding the quality of inmate healthcare, and neither Dorning nor Madison County have made any effort to hold ACH accountable for how it handles inmate healthcare.

149.   Incredibly, when the contact was put up for bid in late 2013, instead of using the deaths as a reason to get a new medical contractor at the jail, Dorning, Morrison, and Madison County used the circumstances to leverage better contractual terms from ACH, getting ACH, in the new agreement signed in February and March

2014, to agree to refund the county when outside medical costs do not exceed $200,000 in a quarter.

150. Directly applicable to the death of Listau and to Davis, defendants Dorning, Morrison, Williams, Townsend developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs. While defendants were aware that severe withdrawal symptoms, including DTs, could only be safely treated in the hospital, these defendants established a custom or policy that withdrawal would **always** be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms. Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the huge cost associated with a hospitalization. *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm (noting that a person experiencing DTs may need to be kept in a sedated state for a week or more).

151. Dorning's public comments regarding the three lawsuits reflect a callous attitude toward inmates suffering from alcohol or drug withdrawal.

152. In summary, the deliberately-indifferent policies and practices of Dorning, Morrison, Johnson, Williams, Townsend, and ACH in place at the Madison County Jail include, but are not limited to, the following:

a.      Not investigating serious known incidents of deliberate indifference by

ACH and correctional personnel;

b.      Not evaluating or responding to inmate grievances regarding medical care;

c.      Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital;

d.      Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital (i.e., severe abdominal pain and clear heart attack symptoms);

e.      Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital;

f.      Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment of the obvious deterioration;

g.      Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch;

h.      Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch;

26

i.      Not monitoring the vital signs of inmates who are placed in medical watch;

j.      Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk;

k.      Not monitoring the food and water intake of inmates known not to be eating or drinking or to be doing so only in limited amounts;

l.      Treating the responses of incoherent inmates as refusals to cooperate;

m.      Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital;

n.      Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions;

o.      Continuing failed treatment regimens even after they have proven ineffective;

p.      Denying inmates with serious pain appropriate pain medication, including narcotics;

q.      Delaying proper treatment of easily treatable conditions (i.e., abscessed teeth) until they become life-threatening;

r.      Not taking inmates suffering from serious complications related to

detoxification from alcohol and drugs to the hospital; and

s.    Ignoring possible medical needs of inmates with mental health issues (or perceived mental health issues) that limit or prevent the inmate from communicating with correctional and medical personnel regarding their medical needs.

153.    Defendant ACH acted through one or more individuals who acted as final policymakers for ACH, including defendants Johnson, Williams, and Townsend.

154.    All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Davis, to obtain necessary medical treatment for Davis in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Davis' pain and suffering and eventual death.

155.    All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Davis in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

156.    All defendants acted with intent to violate Davis' constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

28

157.   As a result of the conduct of defendants, Davis suffered physical and emotional injuries and then died.

## Count I - 42 U.S.C. § 1983 -
## Deliberate Indifference to Serious Medical Needs

158.   The individual defendants except Dorning and Johnson, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Davis' serious medical needs as described above.  These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Davis of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

159.   Defendants Dorning, Morrison, Johnson, Williams, and Townsend are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above. These defendants did thereby deprive Davis of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

160.   Defendant ACH is liable because its customs and policies caused Davis' rights to be violated.

161.   Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Davis, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Davis' suffering and eventual death and the individual defendants' denial of necessary medical treatment for Davis' serious medical needs.

162.   Defendant Dorning is also liable for the acts of ACH and its policymakers, including Johnson, Williams, and Townsend, as Dorning delegated his final policymaking authority to ACH.

163.   As a result of the conduct of defendants, Davis was caused to suffer physical and emotional injuries and to incur unnecessary medical expenses.

## Count II - Negligence / Wantonness

164.   The individual ACH defendants and unknown ACH employees involved with Davis' care owed a duty to Davis to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.  This standard of care required, among other things, timely identification and treatment of Davis' alcohol withdrawal, appropriate monitoring of Davis' deteriorating condition, and referral of

Davis for evaluation and treatment outside of the jail.  These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Davis suffered physical and emotional injuries and incurred unnecessary medical expenses.

165.  Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

## Other Matters

166.  All conditions precedent to the bringing of this suit have occurred.

## Relief Sought

167.  As relief, plaintiff seeks the following:

a.  That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

b.  That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

c.  That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d.  That plaintiff be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

e.  That plaintiff be awarded appropriate declaratory and injunctive relief; and

f.  That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

**Dated: July 14, 2016.**

s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

## Jury Demand

Plaintiff requests a trial by jury.

s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III