# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROY LEE DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:16-cv-01166-AKK** |
| **MADISON COUNTY, ALABAMA,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case arises out of Roy Lee Davis' brief pretrial detention in the local

jail for Madison County, Alabama. Davis asserts, via § 1983, that the County,

Sheriff Blake Dorning, numerous employees of Advanced Correctional Healthcare,

Inc. (ACH), a private corporation providing medical services at the Jail, and Dr.

Arthur M. Williams, the Jail's medical director, were deliberately indifferent to his

serious medical needs in violation of the Fourteenth Amendment of the United

States Constitution.[1]  The Defendants have now each moved for summary

---

[1] Davis originally asserted state law tort claims against the ACH Defendants pursuant to
the Alabama Medical Liability Act, Ala. Code § 6-5-480 *et seq.* Davis has agreed to the
dismissal of those claims. Doc. 143 at 5. Davis has also conceded his claims against the County.
*Id.* Accordingly, the County's motion, doc. 133, is due to be granted. Finally, with respect to
deceased Defendant Steve Morrison, *see* doc. 21, the time for Davis to file a motion for
substitution pursuant to Rule 25 of the Federal Rules of Civil Procedure has expired.
Accordingly, all claims against Morrison are due to be dismissed. *See* Fed. R. Civ. P. 25(a)(1)
(noting that if a proper motion "is not made within 90 days after service of a statement noting the
death, the action . . . against the decedent must be dismissed).

judgment, docs.  127; 130; 133; and 136, contending that Davis received constitutionally adequate medical care, and, that with respect to Davis' claim against Sheriff Dorning and Dr. Williams, qualified immunity applies.  Those motions are now fully briefed.  Docs. 128; 131; 134; 137; 143; 147; 149; 152.  After careful consideration of the record, the briefs, and the applicable law, the court concludes that each motion is each due to be granted.

## I.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "a party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 256.  However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.  Indeed, it is explicitly not the role of the court "to weigh conflicting evidence or to make credibility determinations."  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

"[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  Nor will "a . . . scintilla of evidence in support of the nonmoving party . . . suffice."  *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quotation omitted).  In short, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).  Thus, the nonmovant must demonstrate more than the existence of "some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted).

As is particularly significant here, although reasonable inferences are to be drawn in favor of the nonmoving party "an inference based on speculation and conjecture is not reasonable."  *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotation omitted).  In other words, "[t]hough factual inferences are made in the [nonmovant's] favor, this rule applies only '*to the extent supportable by the record*.'"  *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) (quoting *Scott*, 550 U.S. at 381 n.8) (emphasis original).  So, "the mere fact

that the record, when viewed in the light most favorable to Plaintiff, is theoretically not inconsistent with [her] narrative, is not enough to survive summary judgment." *Hammett v. Paulding Cty.*, 875 F.3d 1036, 1050 (11th Cir. 2017). Instead, "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, and may not normally rely on "discredited testimony" to create a genuine issue of material fact. *Id.* at 256–57 (quotation omitted).

## II. FACTS

The following facts are based primarily on the medical records rather than Davis' own testimony. In fact, Davis has no recollection of his time in the Jail, and testified that he neither suffered from delirium tremens nor required medical attention while detained. Doc. 132-1 at 14–17, 19.[2]

Davis, an alcoholic, turned himself in to the Jail on July 17, 2014 after violating his probation. *Id.* at 7–8, 11, 17; Doc. 138-10 at 2, 4. During the booking process, Davis completed a screening interview which included questions

---

[2] The court questions whether, in light of this testimony, additional evaluation of Davis' claim is necessary. The Eleventh Circuit has explained that the court "should not consider for summary judgment purposes . . . testimony of a witness that is more favorable on a factual issue than the nonmoving party's own testimony." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1295 (11th Cir. 2012). In other words, "[w]hen the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts . . . and then string together those portions of the record to form the story that [the court] deem[s] most helpful to the nonmovant." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc). Still, given the significant documentary evidence bearing on Davis' medical issues and the treatment he received, the court declines to accept Davis' statements as dispositive of his claim.

regarding whether Davis had recently ingested "dangerous levels" of drugs or alcohol or had ever suffered from "serious withdrawal symptoms." Doc. 138-10 at 23–24. Davis answered both questions in the negative. *Id.*

At around the same time, Nurse Sherri Hakes completed a medical screen and health history for Davis. Doc. 138-16 at 2–3. While Davis denied a history of alcohol abuse to Hakes, he did disclose that he drank three beers four times a week and had last consumed alcohol the previous day. *Id.* at at 3–4. Davis also told Hakes about a recently suffered thumb injury, prompting Hakes to clean and dress the wound and to instruct Davis to complete a sick-call request in order to receive additional treatment. *Id.* at 3. Hakes also noted that Davis' vital signs were normal, and that he did not appear intoxicated. *Id.* at 3–4.

Following the medical screening, Davis was placed in general population without incident. *Id.* at 4. Roughly four days later, Nurse Maria Sanchez assessed Davis in his cell. Doc. 138-19 at 2–3. Sanchez documented that although Davis was awake, alert, and breathing normally, his blood pressure was elevated and he was exhibiting signs of confusion. *Id.*; Doc. 138-11 at 14. Consistent with Jail protocol, Sanchez telephoned Dr. Williams, who ordered the completion of various diagnostic tests and instructed the nursing staff to check on Davis three times a day. Doc. 138-19 at 3.

Later that same day, Davis submitted a request to receive medication for his injured thumb. Doc. 138-17 at 3. Nurse Rose Moore examined Davis and noted that he was now suffering from severe hand tremors, confusion, and hallucinations, in addition to his previously recorded high blood pressure. *Id.* at 2–3; Doc. 138-11 at 15. Moore contacted Dr. Williams and relayed this information, as well as Davis' history of alcohol use. Doc. 138-17 at 3. Dr. Williams instructed Moore to provide Davis with a 50 mg dose of Librium, a drug used to treat the symptoms of withdrawal, as well as additional medication for Davis' blood pressure. *Id.* at 3–4. Moore also advised detention officers to transfer Davis to the medical unit for further observation. *Id.* at 4. That evening, Nurse Dee Florence examined Davis, noting that his vital signs were normal, but he was still hallucinating and exhibiting minor tremors in his extremities. Doc. 138-18 at 2–3. Florence followed up with Dr. Williams, who instructed her to administer another 50 mg dose of Librium to Davis immediately and prescribed a 25 mg dose of Librium for Davis provided three times a day for the next three days. *Id.* Florence also scheduled an appointment for Davis with Dr. Williams. *Id.*

After this point, Jail records indicate that detention officers and medical personnel periodically checked on Davis during the night, and that Davis received his scheduled 25mg dose of Librium in the morning. Docs. 138-10 at 14; 138-11 at 9. However, because Davis appeared to still be suffering from hallucinations,

the ACH nursing staff again contacted Dr. Williams, who directed the staff to administer a 100 mg dose of Librium and to increase Davis' prescription from 25 mg to 50 mg of Librium administered three times daily. Docs. 138-11 at 20; 138-21 at 2–3. Davis remained in the medical unit under observation and continued to receive his scheduled medications. Doc. 138-11 at 9–11.

The following morning, roughly two days after Davis first presented with symptoms of alcohol withdrawal, Dr. Williams personally examined Davis. Doc. 138-11 at 23. Dr. Williams found Davis calm, and he noted that Davis no longer appeared to be suffering from tremors or psychiatric issues. *Id.* Dr. Williams testified that he believed Davis' symptoms were mild, at worst, and that Davis was not experiencing delirium tremens, or any other serious medical issues. Doc. 132-3 at 5, 8–10. Dr. Williams reduced Davis' Librium prescription to twice a day and also prescribed additional medications to control Davis' blood pressure. Docs. 138-11 at 23; 132-3 at 4, 8–9. Davis remained under medical observation following his appointment with Dr. Williams. Docs. 138-11 at 23; 132-3 at 4.

The next afternoon, Davis was released from the Jail following a court hearing in his case. Doc. 132-9 at 29; 132-2 at 9–10. At the hearing, Davis was trembling and unable to walk without assistance. Doc. 132-2 at 9–10. Davis' brother testified that court personnel at the hearing, including the judge, noticed that Davis' condition appeared to require medical attention, and that although

Davis was alert and orientated at the hearing, "he was really, very highly confused . . . [and] out of it." *Id.* at 10.

After Davis' release from the Jail, his family took him directly to Madison Hospital. *Id.* at 10. Davis' brother noted that Davis displayed signs of confusion and disorientation during the trip to the Emergency Room, and that Davis was trembling and unable to walk on his own. *Id.* at 10, 12–13. At the E.R., Dr. Daniel Ingram noted that, although Davis lacked visible tremors, he was unsteady and confused. Doc. 132-11 at 14, 16. Dr. Ingram administered a dose of Librium, *id.* at 8, and arranged for Davis' admission to a different hospital based on "an emergency medical condition." *Id.* at 5. Medical records from that hospital indicate that, although Davis was stable and not displaying the symptoms of delirium tremens, he was still confused and experiencing other psychological issues. *Id.* at 9–10. Davis received IV fluids and was placed in the hospital's alcohol protocol for additional testing. *Id.* at 9–11. Davis was discharged the next day reportedly feeling much "better." *Id.* at 11.

## III.  ANALYSIS

The court turns now to Davis' § 1983 deliberate indifference claims alleging that Dr. Williams, Sheriff Dorning, ACH, and numerous ACH employees provided constitutionally inadequate medical care while Davis was detained. "Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth

Amendment." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). However, as a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment technically applies to Davis' claim. *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1268 (11th Cir. 2005). In either event, "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert*, 510 F.3d at 1326.

To survive summary judgment, Davis must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). "[A]lcohol withdrawal is a serious or urgent medical problem that requires immediate medical attention." *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425–26 (11th Cir. 1997) *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009)). Thus, the court finds that Davis' withdrawal symptoms created the requisite substantial risk of serious harm to satisfy the first prong of the inquiry.

To fulfill the second element, i.e., deliberate indifference, "[Davis] must prove three things: (1) [the jail official's] subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (quotation

omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An official's disregard of the risk exceeds mere negligence when she "knows that an inmate is in serious need of medical care, but . . . fails or refuses to obtain medical treatment for the inmate." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (quotation omitted). Similarly, "where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs . . . [or through] grossly inadequate care [or] by a decision to take an easier but less efficacious course of treatment." *Id.* Importantly, however, "[m]ere medical malpractice . . . does not constitute deliberate indifference . . . [n]or does a simple difference in medical opinion." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Finally, causation, the third element of a deliberate indifference claim, requires the plaintiff to show that the defendant has a causal connection to the constitutional harm alleged. *See Hale*, 50 F.3d at 1582. Critically, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)

(quotation omitted). Instead, a supervisor is liable either "when [she] personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). This causal connection exists when: "1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (quotation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (quotation omitted). Moreover, in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

With this framework in mind, the court now individually addresses the claims against each Defendant.

## A. Dr. Williams

Dr. Williams raises three primary arguments in support of his motion for summary judgment. The court addresses them below.[3]

### 1. Whether Davis Suffered from a Serious Medical Need

Dr. Williams contends that there is no evidence that Davis suffered from delirium tremens and that alcohol withdrawal alone does not qualify as a serious medical need. However, Dr. Williams' focus on the absence of delirium tremens is misplaced. As explained, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326 (quotation omitted). Here, the record reflects that Davis was hallucinating, exhibiting signs of confusion, experiencing high blood pressure, had "severe" hand tremors, and was otherwise in enough distress that lay people, including his brother, were immediately able to recognize his need for medical treatment. Doc. 138-11 at 14-15; 132-2 at 9–10. Also, at an unrelated sick call, a nurse noted Davis' disorientation and tremors and immediately contacted Dr. Williams for assistance. Doc. 138-11 at 15. Based on this record, even if Dr.

---

[3] Dr. Williams argues first that he qualifies as a "government official" and is entitled to qualified immunity. This argument is unavailing because this defense is not available to privately employed prison physicians. *See, e.g.*, *Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) (concluding that "the defendant, due to his status as a privately employed prison physician, is ineligible to advance the defense of qualified immunity"); *Smith v. Salter*, No. 16-0588-CG-N, 2018 WL 1354466, at *2 n.2 (S.D. Ala. Feb. 8, 2018) (noting that "private actors" are not entitled to immunity "whether qualified or absolute").

Williams is correct about the absence of delirium tremens, it is apparent that Davis was in obvious medical distress, even from a lay perspective. Therefore, the court reaches the unremarkable conclusion that, at the least, a question of material fact exists regarding the existence of a serious medical need. *See Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010) (indicating that the receipt of reports of hallucination, incoherence, and physical weakness sufficed to establish "actual knowledge of [a] risk of serious harm").

2. *Whether Davis has Shown that Dr. Williams Acted with Deliberate Indifference to Davis' Serious Medical Need*

Dr. Williams next argues that he was not deliberately indifferent to Davis' serious medical need because he provided appropriate medical treatment as soon as the nursing staff informed him of Davis' symptoms. The medical record strongly supports Dr. Williams' position. Specifically, as soon as Dr. Williams was informed of Davis' condition, Dr. Williams prescribed a variety of medications, ordered diagnostic testing, and instructed the nursing staff to place Davis under medical observation. Docs. 138-11 at 5; 138-19 at 3; 138-17 at 3–4. After moving to the medical unit, Davis remained in stable condition and Dr. Williams continued to adjust Davis' Librium prescription, essentially the same course of treatment Davis received at the emergency room following his release from the Jail. Docs. 132-11 at 8; 138-11 at 15–17, 23; 138-18 at 3; 138-21 at 3. Additionally, Dr. Williams examined Davis personally within two days of the onset of withdrawal

symptoms, finding that Davis was improving with continued treatment. Doc. 138-11 at 23. Even after the examination, Davis remained in the medical unit under observation and Dr. Williams instructed the nursing staff to continue to provide Librium. *Id.* at 9–11, 23.

Davis argues that his condition on the day of his release—when court personnel noted his need for medical care—suggests clearly that Dr. Williams should have provided additional treatment. Doc. 132-2 at 9–10, 12–13. However, "[t]he question of whether additional diagnostic techniques or alternate forms of treatment should be employed constitutes 'a classic example of a matter for medical judgment' and does not support [a Fourteenth] Amendment claim." *Clas v. Torres*, 549 F. App'x 922, 923 (11th Cir. 2013) (*Estelle*, 429 U.S. at 107). Indeed, "'where a [detainee] has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law.'" *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (1st Cir. 1981)).

While the court recognizes that delivering grossly inadequate treatment can constitute deliberate indifference, to make this showing in cases involving medical judgments, "a plaintiff may need to do more than refer to prior cases . . . [and instead] produce opinions of medical experts which assert that the official's actions

were so grossly contrary to accepted medical practices as to amount to deliberate indifference." *Howell v. Evans*, 922 F.2d 712, 720 (11th Cir. 1991). Davis has failed to provide expert testimony or any other evidence to establish the appropriate standard of medical treatment for alcohol withdrawal. Given this lack of evidence, there is nothing to show that Dr. Williams' care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). This is also not the archetypical deliberate indifference case where the plaintiff is "challenging the lack of response to a known medical condition." *Waldrop*, 871 F.2d at 1036; *see also Howell*, 922 F.2d at 720 (explaining that "the standard for deliberate indifference focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action"). Rather, when confronted with Davis' situation, and when informed of changes in that condition, Dr. Williams acted to provide treatment.

Acknowledging that Dr. Williams repeatedly acted in response to his withdrawal symptoms, the heart of Davis' claim centers on the purported shortcomings of the treatment. Specifically, Davis appears to believe that Dr. Williams' failure to send him to an outside hospital constituted deliberate indifference. This contention is unavailing. As an initial matter, even if Dr. Williams' medical approach proved to be in error, "[s]imple medical malpractice

certainly does not rise to the level of a constitutional violation . . . [and] when a prison inmate has received medical care, courts hesitate to find [a Fourteenth] Amendment violation." *Waldrop*, 871 F.2d at 1035. Moreover, an inquiry into a physician's medical decisions "is . . . fact-specific and dependent on medical knowledge." *Howell*, 922 F.2d at 720. In other words, Dr. Williams' conduct "must be evaluated according to professional standards," *Waldrop*, 871 F.2d at 1035, and under those standards the care he provided must be "grossly incompetent" to amount to deliberate indifference. *Id.*

There is nothing in this record to support a finding that Dr. Williams provided "grossly incompetent" care. In fact, the only evidence pertaining to the appropriate course of treatment is Dr. Williams' testimony that he did not believe that Davis was suffering from severe withdrawal requiring hospitalization and that observation and treatment in the Jail was appropriate. Doc. 132-3 at 5, 8. While Davis may disagree, Dr. Williams' conclusion was subsequently reinforced by an outside hospital treating Davis with Librium, the same medication that Dr. Williams prescribed. Doc. 132-11 at 5. In light of the lack of evidence to establish that the prescribed course of treatment was even negligent, there is no basis to find that Dr. Williams delivered grossly inadequate medical care.

To avoid this conclusion, Davis asserts that the medical notes do not reflect the true course of treatment he received. However, "discredited [evidence] is not

normally considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256–57. "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257. Here, Davis has not presented any evidence to contradict Dr. Williams' medical conclusions or treatment decisions, and the fact that the results of Dr. Williams' examination are markedly different than other medical records does not substantiate Davis' conclusory assertion that Dr. Williams never examined him. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (explaining that "when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper") (emphasis original).[4]

Likewise, the absence of medical notes in Davis' chart after Dr. Williams' examination, coupled with Davis' apparent deterioration does not alter the court's analysis. First, there is nothing in the record to indicate that Davis regressed so significantly after Dr. Williams' examination that he required additional treatment beyond what Dr. Willams had already instructed the nursing staff to provide. *See* 138-11 at 23. Indeed, the record reflects that Davis was still under medical observation as his vital signs were charted after Dr. Williams examined him and

---

[4] Indeed, it is not unusual that Davis appeared vastly improved when Dr. Williams' examined him because withdrawal symptoms typically vary, sometimes significantly, over time. *See* Doc. 132-3 at 24.

when he was released.  *Id.* at 3, 10–11.  Moreover, Davis has presented no evidence that to comply with the necessary standard of care Dr. Williams should have instructed the nursing staff to make detailed progress notes in Davis' chart.

Further, Davis has failed to show that Dr. Williams was even aware of Davis' purportedly deteriorating condition.  After he examined Davis, Dr. Williams prescribed medication for Davis and directed a continuing course of treatment for him.  Doc. 138-11 at 23.  Thereafter, Davis remained under medical observation until his release from the Jail.  *Id.* at 3, 9–11.  To hold Dr. Williams liable for a failure to provide additional treatment responding to Davis' decline requires a showing that Dr. Williams was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Davis existed], . . . he must also draw the inference."  *Farmer*, 511 U.S. at 837.  To the extent that the nursing staff failed to notify Dr. Williams of significant changes in Davis' condition, as they had previously done repeatedly, *see id.* at 14–17, there is nothing to show that Dr. Williams possessed the requisite level of knowledge regarding Davis' decline such that his failure to provide additional treatment amounted to deliberate indifference.  Moreover, while Dr. Williams was doubtless generally aware of Davis' condition, he evaluated the condition and prescribed treatment, relying on ACH staff to adequately provide that treatment.  Given the lack of evidence to establish the inadequacy of this course of action, Davis cannot show

that Dr. Williams' failure to personally monitor Davis amounted to medical care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058.

Ultimately, while Davis is correct that "the record, when viewed in the light most favorable to [him], is theoretically not inconsistent with his narrative," mere hypotheticals are not enough at this stage of the proceeding. *Hammett*, 875 F.3d at 1050. Davis has failed to put forward evidence demonstrating that Dr. Williams' response to Davis' medical condition "was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quoting *Estelle*, 429 U.S. at 105–06); *see also Anderson*, 477 U.S. at 257 (noting that the plaintiff must put forward "affirmative evidence in order to defeat a properly supported motion for summary judgment"). As Dr. Williams points out, there is no dispute that Davis received immediate, continuing treatment after jail officials noticed that Davis was displaying symptoms associated with alcohol withdrawal. In the absence of affirmative evidence showing more than Davis' belief that he was entitled to some different course of treatment, which is "a classic example of a matter for medical judgment," rather than a constitutional violation, *see Estelle*, 429 U.S. at 107, the claim against Dr. Williams fails.

## B. ACH and the ACH Nursing Staff

Davis' claims against ACH and various members of its nursing staff all rely on the same grounds: i.e., that ACH and its nursing staff failed to adequately identify Davis' risk of withdrawal when he was booked into the Jail and subsequently failed to provide adequate treatment for his condition. Although "[e]ach individual Defendant must be judged separately and on the basis of what that person knows," *Burnette*, 533 F.3d at 1331, the court will make an exception here because the allegations against the ACH Defendants generally mirror each other. Indeed, with the exception of Hakes, who dealt with Davis at intake, all the other nurses provided Davis with some level of medical attention during his detention. Similarly, the named ACH supervisors were uniformly unaware of Davis' condition,[5] and Davis argues only that they established a policy of providing constitutionally deficient healthcare to detainees suffering from the symptoms of alcohol withdrawal. Accordingly, except for Hakes, the court will address the claims raised against these respective groups of Defendants together.

_____

[5] Davis does argue that one of these Defendants, ACH Administrator Janice Townsend, was aware of Davis' medical condition because ACH nurses testified that they generally reported significant issues to her. *See* Docs. 143 at 37; 138-7 at 11. However, Townsend specifically testified that she was unaware of Davis' condition and not involved in his treatment, and Davis has failed to put forward any record evidence showing her involvement. Doc. 138-14 at 3. At this stage of the proceeding, the court draws all reasonable inferences in Davis' favor, but it has no factual basis to conclude that Townsend was subjectively aware of the course of Davis' treatment. Accordingly, the court declines to find that Townsend was directly involved in Davis' treatment. *See Penley*, 605 F.3d at 853 (noting that "though factual inferences are made in the [nonmovant's] favor, this rule applies only 'to the extent supportable by the record'") (quotation omitted) (emphasis original).

*1. Nurse Sherri Hakes*

Hakes conducted the initial intake evaluation at Davis' booking. Doc. 138-16 at 3. Although not expressly articulated in his brief, Davis appears to believe that Hakes' failure to identify him as a risk for withdrawal symptoms constituted deliberate indifference. However, it is undisputed that Davis was neither intoxicated nor exhibiting the symptoms of withdrawal during the booking process. Doc. 143 at 8. While Davis informed Hakes that he drank three beers four times a week, Davis also relayed that he had never experienced withdrawal symptoms. Doc. 138-16 at 4. Hakes noted Davis' drinking habits, as well as his preexisting thumb injury. *Id.*

There is no basis on this record to indicate that Hakes should have known that Davis was a risk for withdrawal symptoms. As explained, to be liable for deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Farmer*, 511 U.S. at 837. Davis testified that he had never gone through withdrawal before, doc. 132-1 at 16–17, 19, and has not pointed to any medical records that Hakes could have reviewed at booking to learn that he was a withdrawal risk. Also, there is no evidence that the failure to identify Davis as a withdrawal risk based on the history of alcohol use he disclosed at intake constituted medical care "so grossly incompetent, inadequate, or excessive

as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058. Indeed, Davis admits that his disclosed alcohol history was insignificant. *See* Doc. 143 at 32. Accordingly, the claim against Hakes is due to be dismissed.[6]

### 2. ACH Nurse Defendants who Provided Medical Care to Davis.

Davis also asserts deliberate indifference claims against each nurse he interacted with during his detention. While he does not specifically articulate his claims against each of these eight Defendants, it is apparent that he believes they failed to evaluate him appropriately, and that this failure prevented the nurses from referring him to a hospital for emergency treatment. The evidentiary record, however, does not support a finding that any of the nurses provided care so inadequate as to qualify as deliberately indifferent. *See id.*

To the contrary, when each of the named nurses encountered Davis, they evaluated his condition, and, based on his symptoms, either contacted Dr. Williams for instructions or administered the medication Dr. Williams had previously

---

[6] In further support of his claims against Hakes, Davis cites to the subsequent medical records from his detention which indicate that Davis had a history of drinking and was drinking prior to intake. Doc. 138-11 at 15–17. However, these comments are consistent with the intake notes in which Davis informed Hakes that he drank three beers multiple times a week and that he last consumed alcohol the day before his booking. Doc. 138-16 at 4; *see also* Doc. 138-11 at 4–7. There is no evidence to indicate that this level of moderate alcohol consumption created such a high risk of severe withdrawal symptoms that Hakes' failure to take additional steps at intake to begin treatment constituted deliberate indifference. As for Davis' contention that the intake record was altered, while the court is required to draw reasonable inferences in the Plaintiff's favor, "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund*, 723 F.3d at 1294. Accordingly, the court declines to find that Davis' intake records were altered given the complete lack of evidence to substantiate this allegation.

prescribed. *See* Docs. 138-19 at 3; 138-17 at 3–4; 138-18 at 3; 138-11 at 9–11, 20–21, 23. There is nothing to indicate that these individuals ignored Davis' obvious medical distress or failed to take immediate steps to treat his withdrawal symptoms. Indeed, the nurses administered Librium, other medication for controlling Davis' blood pressure, and monitored Davis' vital signs, essentially the same treatment Davis received at outside hospitals after his release. *See* Docs. 132-11 at 8; 132-11 at 9–11, 14–17. Quite simply, this is not treatment "so cursory as to amount to no treatment at all." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995).

Davis' complaint seems to again concern the quality of the care these Defendants provided. However, "[t]he question of whether additional diagnostic techniques or alternate forms of treatment should be employed constitutes 'a classic example of a matter for medical judgment' and does not support [a Fourteenth] Amendment claim." *Clas*, 549 F. App'x at 923 (*Estelle*, 429 U.S. at 107). Thus, when, as here, "an inmate receives medical treatment but desires different modes of treatment, the care provided does not amount to deliberate indifference." *Sifford v. Ford*, 701 F. App'x 794, 795 (11th Cir. 2017).

Moreover, Davis bears the burden of putting forward affirmative evidence demonstrating that the nurse Defendants' actions exceeded gross negligence such that they were deliberately indifferent to his condition. *See Bozeman*, 422 F.3d at

1272.  Again, this inquiry "is . . . fact-specific and dependent on medical knowledge," *Howell*, 922 F.2d at 720, and the conduct of the ACH nurses "must be evaluated according to professional standards," *Waldrop*, 871 F.2d at 1035, to ascertain whether the care provided was so "grossly incompetent" as to amount to deliberate indifference.  *Rogers*, 792 F.2d at 1058.  Just like Davis' claim against Dr. Williams, Davis has presented no medical evidence to establish that these Defendants' behavior amounted even to negligence, let alone deliberate indifference.  *See Adams*, 61 F.3d at 1543 (explaining that "not every allegation of inadequate medical treatment states a constitutional violation" and that "[m]ere negligence in diagnosing or treating a medical condition is . . . insufficient").

   *a. Alleged Failure to Use Objective Diagnostic Metrics*

   Perhaps because of the paucity of evidence pertaining to the relevant medical standards, Davis relies heavily on the nursing staff's alleged failure to utilize objective diagnostic tools in evaluating his withdrawal symptoms.  To support this contention, he cites ACH's contract with the County which states that ACH must maintain "substantial compliance with the current Jail Health Standards published by the National Commission on Correctional Healthcare," doc. 135-2 at 3, and that ACH must utilize an objective evaluation metric, e.g., the Clinical Institute Withdrawal Assessment (CIWA) chart, to evaluate individuals going through withdrawal.  Doc. 142-1 at 1.  However, there is no evidence to indicate

that these guidelines or policies either reflect the medical standard of care for alcohol withdrawal or are intended to mirror the constitutional minimum for adequate treatment. *See, e.g.*, *United States v. Boston*, 249 F. App'x 807, 810 (11th Cir. 2007) (noting distinction between constitutional requirements and sound policy); *see also Shaw v. Reno*, 509 U.S. 630, 654 (1993) (noting the difference between "what the law permits and what it requires"). Absent some affirmative evidence that failure to use the CIWA indicates that the "official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference," *Howell*, 922 F.2d at 720, neglecting to employ a particular diagnostic method suggested as a best practice in a manual falls well short of affirmative evidence of deliberate indifference.[7]

### b. Alleged Falsification of Medical Records

Davis argues next that his medical records were falsified based on a discrepancy regarding the date he began receiving medical treatment after submitting a sick-call request for his injured thumb. The form was dated August 19, 2014, well after Davis' release from detention. Doc. 138-11 at 13. Therefore,

---

[7] Davis also characterizes the failure to use an objective diagnostic tool as a form of willful blindness to his need for treatment at a hospital. *See Goebert*, 510 F.3d at 1328 (noting that in the deliberate indifference context a "party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact") (quotation omitted). This is not an instance, as in *Goebert*, where a jail official received a complaint indicating that an inmate had an urgent need for medical care and failed to investigate further. *Id.* at 1327. Instead, the nursing staff repeatedly examined Davis and took action based on the results of those examinations. That a different diagnostic tool may have proved more effective does not indicate that the nursing staff willfully blinded themselves to Davis' condition.

Davis argues that he must have actually submitted the document on July 19, 2018. Doc. 143 at 20. Moreover, because ACH nurses testified that they typically saw inmates within two days of the submission of a sick-call request, doc. 132-7 at 5, Davis hypothesizes that the note Nurse Rose Moore entered referencing his thumb injury and identifying signs of alcohol withdrawal, dated July 21, was actually from July 19. *See* Doc. 138-11 at 15. According to Davis, this means he endured two days without adequate medical care after Moore allegedly recognized his symptoms on July 19.

This line of argument has no support in the record. As mentioned above, Davis specifically stated that he had no medical issues during his detention and he recalls neither experiencing withdrawal symptoms nor receiving any medical treatment. Doc. 132-1 at 14, 16–17, 19. Thus, apart from the medical records, and testimony interpreting those records, no other evidence establishes when Davis first became ill. The sick-call form at issue provides no guidance here, as it references only issues with Davis' thumb, and, standing alone, is patently insufficient to put the ACH Defendants on notice of Davis' withdrawal symptoms. Doc. 138-11 at 13. And, most critically, even if Davis made the sick call request on July 19, the court does not see how it can then infer that Moore responded to the request on July 19, rather than on July 21 as the signed progress note indicates. Doc. 138-11 at 15. Indeed, there is no testimony or documentary evidence to

substantiate such an inference.  While Davis is entitled to all reasonable inferences at this stage of the proceeding, "[a]n inference is unreasonable if a jury must engage in speculation and conjecture to such a degree as to render its findings a guess or mere possibility."  *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1271 (N.D. Ga. 2002) (quotation omitted).  Although the court accepts that Davis likely submitted his request for treatment on July 19, the court has no credible basis to infer from this that Moore responded to the request on the same day and that ACH medical staff subsequently failed to respond to Davis' withdrawal symptoms for two days thereafter. Ultimately, that "the record, when viewed in the light most favorable to [Davis], is theoretically not inconsistent with his narrative, is not enough to survive summary judgment."  *Hammett*, 875 F.3d at 1050.  Rather, Davis must put forward some affirmative evidence supporting his theory.  He has failed to do so with regards to this aspect of his medical records.

The second challenged aspect of the medical records is whether Davis received his prescribed medication on July 23 and 24.  The record belies Davis' contention regarding July 23—he received a Librium dose at 5:00 a.m., after which he was seen by Dr. Williams.  Doc. 138-11 at 9, 23.  Following that examination, Dr. Williams reduced Davis' Librium dose from three times a day to twice a day, and Davis received his second prescribed dose at 7:00 p.m. that evening.  *Id.*

Davis is correct that the medical records reveal that he did not receive his medication on the morning of July 24, the day of his release from the Jail. *Id.* at 9. While this failure may suggest deliberate indifference, Davis has failed to identify the specific nurse(s) who provided care for him on that date. There are two notations for vital signs, and so it is apparent that someone examined Davis on that day without providing his medication. *Id.* at 3, 11. To the extent that individual's identity is buried in the record, however, the court is not obligated to search through the evidence to identify him or her. *See Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) (stating "[j]udges are not like pigs, hunting for truffles buried in [the record]"); *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (the court is not required to "comb through the record to ascertain whether a genuine issue of material fact exists"). Davis' failure to identify the specific nurse in question is particularly significant here because, for a deliberate indifference claim to lie, Davis must demonstrate that a particular jail official had "subjective knowledge of a risk of serious harm." *Bozeman*, 422 F.3d at 1272 (quotation omitted). Absent evidence identifying the individual nurse with subjective knowledge as to Davis' condition on July 24, a claim based on the failure to provide Davis with treatment on that date must fall.

Based on this record, Davis has failed to establish that the ACH nurse Defendants showed deliberate indifference to his medical needs. Therefore, his claims against these Defendants are uniformly due to be dismissed.

### 3. ACH Supervisory Defendants

Davis also asserts deliberate indifference claims premised on supervisory liability against three ACH officials, including ACH's chief executive officer. Davis argues that the policies and customs established by these supervisory Defendants represented the "moving force" behind the alleged provision of constitutionally inadequate care. Indeed, Davis contends that prior incidents involving the deaths of other detainees undergoing alcohol withdrawal should have placed these defendants on notice of their subordinates' failure to properly provide care to detainees in Davis' situation. Davis further argues that these Defendants established the constitutionally deficient policy of failing to comply with ACH guidelines requiring the use of the CIWA to provide an objective diagnostic assessment of inmates experiencing withdrawal. These arguments fail.

As an initial matter, in light of the court's finding that Dr. Williams and the ACH nurses provided constitutionally adequate care to Davis, *see supra* Parts 2 and 3, there is no basis for supervisory liability. *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) (explaining that absent an underlying constitutional violation there can be no supervisory liability on the grounds that a policy or

custom "caused a constitutional violation"); *see also Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) (holding that the plaintiff could not "maintain a § 1983 action for supervisory liability" in light of the court's conclusion that the "[p]laintiff's constitutional rights were not violated").[8]  But, even if the court reached the merits of Davis' claims, they would still fail because there is no causal connection between these Defendants' actions and the asserted constitutional deprivation.

"It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley*, 193 F.3d at 1269 (quotation omitted).  Instead, a supervisor is liable either "when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.  To establish the requisite causal link, Davis must show the existence of either a custom or policy resulting in deliberate indifference to constitutional rights, facts supporting an inference that a supervisor "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," or a

---

[8] This conclusion also holds true with respect to Davis' claims against Sheriff Dorning and ACH based on policy or custom.  *See Knight ex rel. Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 821 (11th Cir. 2017) (explaining that "[t]here can be no policy-based liability or supervisory liability [under § 1983] when there is no underlying constitutional violation").

history of abuse sufficient to put the supervisory official on notice of a need to correct the deficiency. *West v. Tillman*, 496 F.3d 1321, 1328–29 (11th Cir. 2007) (quotation omitted).

Davis appears to accept that ACH's official policies comply with minimum constitutional requirements, and has not factually substantiated his claims, if any, that these supervisory officials had implemented alternative, unconstitutional policies. His argument instead boils down to his belief that the ACH supervisors should have known that staff members at the Jail were not following official ACH policies and acted to correct those deficiencies. In the face of an established constitutionally adequate policy, however, a supervisor is deliberately indifferent only when she disregards "a known or obvious consequence of [her] action," as shown through actual or constructive notice of "a persistent and wide-spread practice." *Goebert*, 510 F.3d at 1332 (quotations omitted). Thus, to place the ACH supervisors on constructive or actual notice of the need to address purported constitutional deficiencies, Davis relies on two prior instances where detainees receiving treatment for alcohol withdrawal in the medical observation unit died. Doc. 143 at 26–29.[9] Under existing law, however, these two tragic deaths,

---

[9] This evidence is, in part, offered through a declaration by Davis' counsel. Among other things, the declaration indicates that legal action involving those incidents was settled for particular amounts of money. Doc. 142-71 at 3. Defendant Dorning has moved to strike the portions of the declaration dealing with these prior incidents, doc. 148, and Davis has failed to file a response. "Declarations used to support or oppose a summary judgment motion . . . must set forth facts that would be admissible under the Federal Rules of Evidence." *Hetherington v.*

occurring roughly a year earlier, doc. 143 at 26, 28, qualify as "isolated occurrences" rather than the "obvious, flagrant, rampant" deprivations "of continued duration" necessary to place a supervisory defendant on constructive notice of the need to correct a constitutional violation associated with "the implementation of a facially constitutional policy." *Goebert*, 510 F.3d at 1332 (quoting *West*, 496 F.3d at 1329); *see also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (pointing out that four cases of constitutional violations over a four year period were insufficient to place supervisory officials on notice of a pattern of violations); *Letson v. Mitchell*, No. 3:13-cv-00168-SGC, 2015 WL 1487731, at *9–10 (N.D. Ala. Mar. 30, 2015) (finding that two incidents of alleged deliberate indifference to the serious medical needs of detainees suffering from withdrawal in county jail were insufficient to constitute a custom or practice of deliberate indifference). This is especially true, where, as here, there is no showing that either of the previous incidents referenced by Davis resulted from the "medical staff [or] detention officers, [acting] negligently or [violating] Jail policy." *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1052 (11th Cir. 2014). In other words, the court is "unable to conclude that these [two prior] policy violations [assuming policy was

---

*Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013) (citing Fed. R. Civ. P. 56(c)(4)); *see also Jones*, 683 F.3d at 1293–94 (passing on the admissibility of hearsay evidence and finding that otherwise inadmissible hearsay could be considered at summary judgment "if the statement could be reduced to admissible evidence at trial") (quotation omitted). Because the proffered testimony is neither relevant nor, with respect to the settlement information, otherwise admissible, *see* Fed. R. of Evid. 408, the court declines to consider that portion of counsel's declaration. Accordingly, the motion to strike, doc. 148, is due to be granted.

indeed violated] are sufficient to create a genuine issue of fact as to the existence of a custom [or policy] so settled and permanent as to have the force of law, that ultimately resulted in deliberate indifference to a substantial risk of serious harm to [Davis]." *Goodman v. Kimbrough*, 718 F.3d 1325, 1335–36 (11th Cir. 2013).

Ultimately, Davis has failed to show that any of the ACH Supervisory Defendants "had actual knowledge" that the alcohol withdrawal policy "was being implemented in a way that ignored medical needs" or that "the misapplication of the policy was so widespread that [the court] can attribute constructive knowledge" to them. *Goebert*, 510 F.3d at 1332. Consequently, Davis' claims against these Defendants fail to satisfy the "extremely rigorous" standard for imposing supervisory liability in this circuit and are due to be dismissed. *Cottone*, 326 F.3d at 1360 (quotation omitted).

### 4. *ACH*

Davis argues also that ACH is responsible for the actions of Dr. Williams, its alleged final policymaker at the Jail. In the Eleventh Circuit, private contractors, like municipalities, "cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992). Instead, corporate entities are subject to liability only when "the execution of the [company's] policy or custom . . . inflicts the injury." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (quotation omitted). The question of

when an official policy or custom exists can be a difficult one, but the Eleventh Circuit has indicated that "an action taken or policy made by an official responsible for making final policy in [an] area of the [company's] business" suffices to establish official policy in that area for purposes of liability under § 1983. *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).

ACH argues that Dr. Williams lacks final policymaking authority for the company because he is an independent contractor and because his actions were ultimately reviewable by the County. The court assumes that Dr. Williams was the final policymaker for ACH at the Jail, but this finding does not end the inquiry. As explained by the Eleventh Circuit, even if Dr. Williams "were the policymaker for [ACH], the state policy structure [could] still require[] other state officials to set final policy." *Howell*, 922 F.2d at 725. In such an instance, because decisions ultimately setting policy were reserved for state officials, the corporate defendant could not be liable under § 1983 for the actions of its final policymaker. *See id.*

Here, ACH's contract is clear that Dr. Williams lacked final policymaking authority regarding treatment decisions at the Jail. The contract provides that ACH must "operate the healthcare program . . . with full reporting and accountability to the Sheriff and Madison County." Doc. 135-8 at 23. The contract also outlines a series of requirements that ACH must meet, including, conducting intake screenings, maintaining minimum staffing levels, and providing regular quality

insurance reports regarding the healthcare services provided. *Id.* at 12–14, 16–18, 20–21. Moreover, the Sheriff has "sole discretion" to determine the appropriate staffing levels at the Jail, retains the ability to discharge ACH personnel, *id.* at 15, 20, and prohibits ACH from making unilateral changes to the Jail's medical policies. *Id.* at 14. Critically, ACH must "arrange all off-site treatment and care in accordance with the Sheriff's policies and procedures." *Id* at 11.

Significantly, Sheriff Dorning meaningfully exercised his final control over the provision of healthcare at the Jail. As he noted, a compliance officer, Courtney Cook, monitors ACH's performance. Doc. 142-56 at 3–4. Among other tasks, Cook testified that she reviews medical grievances and daily medical logs to ensure that ACH adheres to its contractual obligations. *Id.* at 4–5. Cook also refers inmates to ACH for treatment, and she reviews treatment options with ACH personnel when inmates failed to improve after receiving care. Docs. 142-57 at 11; 142-58 at 4–5. Specifically with respect to Dr. Williams, Cook received the list of patients Dr. Williams saw each day and reviewed the progress notes if issues with those patients arose. Doc. 142-58 at 4.

Certainly, Dr. Williams had the discretion to take discrete actions in terms of treating detainees, including deciding whether to send detainees to outside facilities for treatment. Doc. 132-8 at 10–11. However, having discretion to make a particular decision is not synonymous with final policymaking authority.

Moreover, as to the Sheriff, "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. It is equally consistent with the presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). As the Eleventh Circuit has explained, § 1983 liability is generally precluded for municipalities based on "a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). In other words, the essence of a delegation of final policymaking authority is that "the delegation [is] such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989).

As the foregoing discussion makes plain, Sheriff Dorning had the final authority to make policy decisions and to review the discretionary actions taken by ACH and its employees, an authority that he frequently exercised. Therefore, because Dr. Williams lacked the authority to act as the final policymaker with respect to the provision of healthcare at the Jail, "[ACH] could not be found liable, as a matter of law, for [Dr. William's] actions and policies even though he was

[ACH's] authority at the institution," *Howell*, 922 F.2d at 725, and Davis' claim against ACH is due to be dismissed.

## C. Sheriff Dorning

Sheriff Dorning has moved for summary judgment on qualified immunity grounds. Qualified immunity reflects both "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[G]overnment officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for [the] suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999). The parties agree that Sheriff Dorning was acting within his discretionary authority.

Therefore, "'the burden shifts to [Davis] to show that qualified immunity is not appropriate.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). To make this showing, Davis "must demonstrate . . . the following two things: (1) that the defendant violated [his] constitutional rights, and (2) that, at the time of the violation, those rights were clearly established . . . in light of the specific context of

the case, not as a broad general proposition." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (quotation omitted). The court "may decide these issues in either order, but, to survive a qualified-immunity defense, [Davis] must [make] both showings." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017).

Here, the court need not reach the "clearly established" prong of the analysis because Davis has failed to show the existence of a constitutional violation in the first instance. As previously explained, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley*, 193 F.3d at 1269 (quotation omitted). Instead, liability attaches either "when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. As Sheriff Dorning points out, he had no personal involvement in any aspect of Davis' detention, including the provision of medical care to Davis. Thus, to establish the requisite causal link between the actions Davis complains of and Sheriff Dorning, Davis must show the existence of either a custom or policy resulting in deliberate indifference to constitutional rights or a history of abuse sufficient to put the Sheriff on notice of a need to correct the deficiency. *West*, 496 F.3d at 1328–29.

Davis seeks to meet his burden by arguing that the actions of ACH are fully attributable to Sheriff Dorning through the Sheriff's policy of delegating authority to ACH with respect to the provision of adequate medical care to detainees. Davis is generally correct that "[t]he federal courts have consistently ruled that governments . . . have an obligation to provide medical care to incarcerated individuals . . . [and] [t]his duty is not absolved by contracting with [a non-governmental] entity." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). In other words, even though a private entity is contractually obligated to provide medical services, "the [government] itself remains liable for any constitutional deprivations caused by the policies or customs of [the medical provider]. In that sense, the [government's] duty is non-delegable." *Id.*

However, there is no delegation of final policymaking authority "when the final policymaker delegates decision-making discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala*, 116 F.3d at 1399. To impose liability on the supervisory official on the basis of delegated authority, the decisionmaking individual must possess "the authority and responsibility for establishing *final* policy with respect to the issue in question." *Mandel*, 888 F.2d at 793 (emphasis original). That is, "final policymaking authority over a particular subject matter does not vest in an official whose decisions are subject to meaningful administrative review." *Doe v. Sch. Bd. of*

*Broward Cty.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (quotation omitted). For the same reasons discussed previously, because Dr. Williams and ACH were not final policymakers at the Jail, Davis' delegation theory fails,[10] and the claim against Sheriff Dorning is also due to be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the motions for summary judgment, docs. 127; 130; and 136, are due to be granted. The court will issue a separate order consistent with this opinion.

**DONE** the 31st day of July, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[10] Even if Sheriff Dorning had delegated his authority to ACH, it is not clear that that action, standing alone, would subject him to supervisory liability in his individual capacity under § 1983. Liability depends on a showing that Sheriff Dorning was aware that ACH officials would act unlawfully, e.g., that the Sheriff "had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert*, 510 F.3d at 1332. Absent such evidence, an attempt to hold Sheriff Dorning liable for the actions of his subordinates amounts to pure respondeat superior, which is improper in the context of a deliberate indifference claim requiring proof "that a municipal actor disregarded a known or obvious consequence of [her] action." *Id.* (quotation omitted). To the extent Davis' brief can be read to insinuate that the previous deaths of other inmates in 2013 should have placed Sheriff Dorning on notice of a pattern of constitutional violations, that argument fails for the same reasons articulated previously. Moreover, "[a] sheriff cannot be held liable for failing to [properly treat] inmates whom trained medical personnel have concluded [are] not . . . [at] risk of harm" absent additional treatment. *Keith*, 749 F.3d at 1050. In other words, Davis has "not demonstrated that it is 'clearly established' that a sheriff has a constitutional obligation to disregard the medical expertise of the very contractors he has hired to ensure that the inmates' . . . health is tended to." *Id.* "The reason [Davis] has failed to present case law supporting [his] argument is because there is none." *Id.* Thus, even under this theory, Sheriff Dorning would still be entitled to the protection of qualified immunity.